## ARTICLE 1

1. The foregoing Preamble, the Laws and Regulations governing lands held in Usufruct in the Sultanate of Oman shall be part and parcel of this Contract, and shall be concurrently read and interpreted with them. This Contract shall also be an integral part of the Development Agreement entered into between the Parties, together with the schedules thereto. In case of any conflict between this Usufruct Contract and the Development Agreement, the provisions of the Development Agreement shall prevail.

2. The Second Party acknowledges  to have lawfully inspected the Land held in Usufruct in a manner that excludes ignorance, and agrees to hold it in Usufruct, without any right of recourse on the First Party with respect to rights other than those provided for in this Development Agreement.

3. The Second Party shall be entitled to divide the Land into separate parcels, blocks, units or parts and to assign all or part of its rights hereunder to third parties pursuant to the Law promulgated by Royal Decree 12/2006 and its Executive Regulations on  ownership of real estate in integrated tourism complexes.

## ARTICLE 2: TERM OF USUFRUCT

1. The First Party  shall, pursuant to this Contract, grant the Second Party, the Usufruct rights over  the Land for a period of fifty years  (the "Usufruct Term"), renewable subject to  a written agreement between the Parties.

2. The Usufruct Term shall commence from the date of registration of this Contract.

## ARTICLE 3: OBLIGATIONS OF THE FIRST PARTY

1. The First Party shall deliver the Land free of any encumbrances or rights limiting the Usufruct and warrants that no government body or third party will obstruct the Second Party during the Term of Usufruct, failing which, the Second Party shall have the right to terminate this Contract without prejudice to his right to demand payment of damages as set out in the Development Agreement.

2 The First Party shall register this Contract with the Real Estate Registry at the Ministry of Housing, Sultanate of Oman on or immediately after ratification of the Development Agreement. The registration charges shall be at the expense of the Second Party.

3 The Second Party shall be granted exemption from payment of Usufruct rates and incentives and concessions in accordance with pertinent regulations as set out in the Development Agreement.

4. The Second Party shall be exempted from payment of the Annual Usufruct Rent during the first five (5) years of this Contract starting from the date of the registration of the Usufruct Rights in the name of the Second Party

SC-2/2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OMAGINE, INC.,

Plaintiff,

v.

ROYAL COURT AFFAIRS,
SULTAN QABOOS BIN SAID

Defendant.

CLAIM ARISING FROM BREACH OF CONTRACT

JEFFREY A. KOSTERICH, LLC
68 Main Street
Tuckahoe, NY 10707
(914)395-0055 (phone)
(914)395-0230 (facsimile)
Counsel for Plaintiff

CLAIM

1.  Omagine, Inc. is a publicly traded Delaware, U.S.A. corporation and the majority shareholder of Omagine LLC, an Omani limited liability company ("Omagine-Oman").

2.  Omagine-Oman has a contract (the "Development Agreement") with the government of the Sultanate of Oman (the "Oman Government") represented by its Ministry of Tourism ("MOT") to develop a mixed-use tourism and residential real estate project in Oman (the "Omagine Project"). After almost nine years of negotiations with several different officials within the MOT, the Development Agreement for the Omagine Project was finally signed by the MOT and Omagine-Oman in October 2014 and ratified by the Oman Government's Ministry of Finance in March 2015. Please see the Development Agreement attached hereto as Exhibit A.

3.  In addition to the Development Agreement, an agreement among the then shareholders of Omagine-Oman, (the "Shareholder Agreement") was also signed. Those shareholders are:

    a.  Royal Court Affairs, representing the personal interests of His Majesty Sultan Qaboos bin Said, the ruler of Oman ("RCA"),

    b.  Omagine, Inc. and its subsidiary Journey of Light, Inc. (collectively, "Omagine-USA"), and

    c.  Consolidated Contractors Co. Oman, LLC, ("CCC-Oman") and Consolidated Contracting Company, S.A, ("CCC-Panama"), each of which is a subsidiary of Consolidated Contractors International Company, S.A.L., a Lebanese multinational corporation. CCC-Oman and CCC-Panama are sometimes referred to collectively herein as "CCC".

    Please see the Shareholder Agreement attached hereto as Exhibit B.

4.  The Omagine Project was initially delayed because each of CCC-Oman and CCC-Panama avoided its investment obligation under the Shareholder Agreement. It is Plaintiff's and RCA's opinion that CCC acted in bad faith by orchestrating a deceitful series of actions to avoid signing the construction contract for the Omagine Project (the "CCC Contract") and thereby avoid its investment obligations under the Shareholder Agreement. CCC was subsequently removed as a shareholder of Omagine-Oman. The shareholders of Omagine-Oman as of the date hereof are Omagine-USA and RCA. Please see Exhibit C attached hereto.

5.  Under the Shareholder Agreement:

    a.  Omagine Inc. (Plaintiff) fulfilled all its investment and other obligations;

    b.  CCC avoided its $50 million United States Dollar ("USD") investment obligation via the ploy of causing CCC-Oman to not execute the CCC Contract within the time period called for in the Shareholder Agreement. CCC accomplished this transparent avoidance by orchestrating at least five renegotiations of and verbal agreements to the CCC Contract during such time period and finally resulting in CCC doubling its estimate for the construction costs of the Omagine Project. Omagine, Inc. and RCA refused to authorize Omagine-Oman to sign such an inflated construction contract. Fortunately, this possibility was foreseen in the Shareholder Agreement which provided that if such an event were to occur: (i) CCC could be removed as an Omagine-Oman shareholder, and (ii) RCA's $20 million USD investment obligation would become immediately due and payable;

    c.  His Majesty Sultan Qaboos bin Said personally owned a one million square meter plot

(approximately 245 acres) of beachfront land in Muscat, Oman (the "Project Land"). Via a Royal Decree, His Majesty Sultan Qaboos fulfilled RCA's obligation to invest into Omagine-Oman the exclusive development and sale rights to the Project Land (the "Usufruct Rights").

d. RCA failed to fulfil its obligation to invest its $20 million USD as required.

6. In addition, Omagine Inc. has already paid approximately $33 million USD of "Pre-Development Expenses" (See Exhibit J) to ensure that the Omagine Project remained vibrant and viable in the face of:

   a. The very difficult and lengthy Development Agreement negotiations with the MOT;

   b. CCC's extended negotiation tactics and its ultimate avoidance of its $50 million USD share capital payment obligation to Omagine-Oman; and

   c. RCA's inexplicably extensive and unexplained delays combined with its default in the payment of its $20 million USD share capital obligation to Omagine-Oman.

   All such approximately $33 million USD of Pre-Development Expenses paid by Plaintiff are reimbursable to Plaintiff pursuant to the terms of the Shareholder Agreement.

7. Furthermore, pursuant to the terms of the Shareholder Agreement, Plaintiff is entitled to payment of a ten million USD ($10,000,000) fee (the "Success Fee") which payment has now been obstructed by Defendant's failure and refusal to fulfil its obligations under the Shareholder Agreement signed by Defendant. RCA carried out this obstruction by means of its purposeful delays and refusal to pay its share capital obligation to Omagine-Oman while simultaneously secretly negotiating with several other third parties with the objective of removing Plaintiff from its role as a shareholder of the company developing the Omagine Project. This obstruction by Defendant RCA caused the further obstruction of the design and development of the Omagine Project pursuant to the Development Agreement.

8. Since the July 2016 failure to sign the CCC-Contract, the development of the Omagine Project has been further stymied and extensively delayed because RCA has repeatedly delayed and ultimately failed and refused to honor its obligation to invest 7,678,235 Omani Rials (i.e. $19,963,125 USD) into Omagine-Oman as required by the Shareholder Agreement signed by RCA and the Plaintiff on or about April 20, 2011.

9. Plaintiff has fulfilled all its obligations under the Shareholder Agreement. In fact, as encouraged by RCA, Plaintiff has gone well beyond its contractual obligations by continuing to finance all the ongoing expenses of Omagine-Oman and the Omagine Project after the October 2014 signing of the Development Agreement notwithstanding RCA's failure to satisfy its investment obligation. Despite the good faith efforts put forth by Plaintiff and its Board of Directors, RCA has repeatedly delayed and made excuses and RCA remains in default of its obligations under the Shareholder Agreement, including but not limited to its implied obligations of good faith and fair dealing as well as its stated obligation to invest its share capital into Omagine-Oman.

10. Omagine, Inc.'s courtesy and good faith have been ridiculed and taken for granted by RCA and, without legal justification, RCA has categorically failed and refused to take any steps to cure its contractual breach. This failure by RCA has caused (and will cause) tremendous damage to Plaintiff which damage is estimated to be approximately nine hundred seventy-four million USD ($974,000,000). Please see Exhibits B, E, F, G, H, I and J attached hereto.

11.   RCA signed the Shareholder Agreement and a subscription agreement (the "RCA Subscription Agreement") dated as of April 20, 2011, confirming that RCA had taken a twenty-five percent (25%) shareholding in Omagine-Oman. The Shareholder Agreement memorializes the percentage shareholdings of all the then Omagine-Oman shareholders and the fact that Plaintiff (Omagine, Inc.) would hold a sixty percent (60%) shareholding in Omagine-Oman. See Exhibit B attached hereto.

12.   The RCA Subscription Agreement (which is Exhibit D to the Shareholder Agreement attached hereto as Exhibit B) is the most important document in respect of RCA's required payment obligations for its Omagine-Oman share capital subscription.

13.   Pursuant to the RCA Subscription Agreement, RCA subscribed for a total of 1,250,000 shares of Omagine-Oman and was and is obligated to do the following three things:

   1.   Pay an "Initial Share Subscription Price" of 37,500 Omani Rials ("OMR") [equivalent to approximately $97,500 USD] for its 375,000 "Initial Shares" *[Note: RCA did this in May 2011]*;

   2.   Pay for a further 663,750 shares by way of the agreed non-cash payment-in-kind (the "PIK") under Clause 9 of the RCA Subscription Agreement. The PIK is the granting to Omagine-Oman of the Usufruct Rights over the Project Land *[Note: RCA did this in July 2015]*; and

   3.   Pay for a further 211,250 shares (the "Deferred Shares") for the agreed price of 7,640,625 OMR (equivalent to approximately $20 million USD) [the "Deferred Share Subscription Price"] *[Note: This was due in July 2016 and RCA has failed to do this]*.

14.   Clause 7 of the RCA Subscription Agreement is the relevant contractually agreed clause that memorializes RCA's obligation since July 2016 to pay Omagine-Oman the agreed approximately $20 million USD Deferred Share Subscription Price for the 211,250 Deferred Shares RCA subscribed for under the RCA Subscription Agreement.

15.   RCA's payment obligation arises from the provisions of Clause 7 of the RCA Subscription Agreement and the facts, as follows:

   a.   If a "CCC Event" defined as the occurrence of the conditions specified in either sub-paragraph 9(a) or 9(b) of the CCC Panama Subscription Agreement (which is Exhibit E to the Shareholder Agreement attached hereto as Exhibit B) was to occur, then RCA would become obligated to pay its approximately $20 million USD Deferred Share Subscription Price to Omagine-Oman on the latter of either (i) the Financing Agreement Date, or (ii) the date of the occurrence of such CCC Event (See the CCC Panama Subscription Agreement); *[Note: The Financing Agreement Date occurred in December 2015 (See: Exhibit D) and also a CCC Event [as described in sub-paragraph 9(a) of the CCC Panama Subscription Agreement] occurred in July 2016]*

   b.   Omagine-Oman gave written notice to RCA (a "Deferred Subscription Notice") requesting payment of the Deferred Share Subscription Price. Once that happened, the full amount of the Deferred Share Subscription Price was required to be paid by RCA to Omagine-Oman within 15 Business Days thereafter. It is clear from the June 2016 Omagine-Oman letter to RCA (See Exhibit C attached hereto) and from the numerous meetings, conversations and correspondence subsequent to such June 2016 Omagine-Oman letter that since June 2016

RCA has been on notice and aware of its obligation to pay its approximately $20 million USD Deferred Share Subscription Price;

c.  RCA has clearly been obliged for over two and one-half (2.5+) years to make payment to Omagine-Oman of its approximately $20 million USD Deferred Share Subscription Price.

16.  A "Financing Agreement" is defined under the Shareholder Agreement as a legally binding agreement between Omagine-Oman and a Lender pursuant to which such Lender agrees to provide Debt Financing for the first or any phase of the Omagine Project.

17.  The "Financing Agreement Date" is defined under the Shareholder Agreement as the day upon which Omagine-Oman and a Lender first execute and deliver a Financing Agreement.

18.  The Financing Agreement attached hereto as Exhibit D was signed by Omagine-Oman and a commercial bank - Masraf Al Rayan - on December 2, 2015 and therefore the Financing Agreement Date is December 2, 2015.

19.  A CCC Event occurred because the requirement for the definition of a CCC Event occurring was satisfied when the CCC Contract was not executed within the required twelve (12) month time period (as extended to June 2015) specified in the CCC subscription agreements. (See Exhibit B). *[Note: RCA is aware of the facts and circumstances behind CCC's multiple delays and diversions. See the letter of June 29, 2016 attached hereto as Exhibit C.]*

20.  The plain meaning of RCA's agreed obligation to pay its Deferred Share Subscription Price if a CCC Event occurred was to guard against the possibility of the occurrence of just such a CCC Event thereby enabling the smooth and uninterrupted operation of Omagine-Oman and its design and development activities for the Omagine Project. In fact, however, after the occurrence of the CCC-Event, RCA's default in the face of its contractual obligation caused enormous delays in the design and development of the Omagine Project and to the ongoing operations of Omagine-Oman. RCA's unaccountable delays and behavior moreover caused enormous hardship and damage to Plaintiff's reputation. Moreover, Omagine, Inc. alone bore the entire financial burden for all the Omagine-Oman and Omagine Project ongoing activities through and beyond the Financing Agreement Date, CCC's removal as a shareholder, and RCA's default.

21.  RCA's default prevented the operation of Omagine-Oman's design and development activities for the Omagine Project from continuing thus directly causing MOT to threaten to terminate the Development Agreement. RCA objected to and delayed this termination action by MOT for years (which Plaintiff assumed at the time was RCA acting in good faith) but Plaintiff recently discovered that RCA continued to delay MOT's termination of the Development Agreement (which termination MOT had agreed to leave up to RCA) while at the same time RCA continued to delay payment of its $20 million USD Deferred Share Subscription Price to Omagine-Oman.

22.  Moreover, RCA has internally and to others in the Oman government blamed Plaintiff for these RCA caused delays while simultaneously holding multiple secret negotiations with several Omani and other potential investors with the objective of taking over the Omagine Project and removing or replacing Plaintiff. It is Plaintiff's observation and belief that RCA intentionally undertook these years of delaying tactics in the belief that Plaintiff would give up and abandon the Omagine Project thus leaving RCA with the ability to install its new favored investors and

take control the Project Land (valued at approximately $1 billion USD). It should be noted that **His Majesty Sultan Qaboos personally approved and has long favored the Omagine Project and he invested the Project Land exclusively for use by the Omagine Project.**

23.  RCA has asked Omagine management on multiple occasions over the past two years to write extensive Arabic language letters to RCA explaining this history - all of which management has done despite the duplicative and "busy-work" nature of these requests. In addition, RCA also asked management to write a letter directly to His Majesty Sultan Qaboos (the "Sultan Letter") explaining the Omagine Project history and current situation. RCA promised Omagine management that RCA would hand deliver the Sultan Letter to His Majesty Sultan Qaboos, discuss the Omagine Project situation with His Majesty and resolve the matter with His Majesty. Despite having sent the Sultan Letter over 18 months ago to RCA as requested, management has information and is of the belief that RCA has to this day never delivered the Sultan Letter to His Majesty nor has RCA discussed its contents with His Majesty. Based on management's observations over its many years in Oman, management's firm belief is that His Majesty the Sultan (who has been seriously ill but working for the past several years) would never allow this plainly dishonorable behavior by RCA to prevail if he were informed of it.

24.  In the light of the above, it is clear that under Clause 4.1 of the Shareholder Agreement and Clause 7 of the RCA Subscription Agreement, RCA has been long obligated to pay the $20 million USD Deferred Share Subscription Price to Omagine-Oman. RCA's purposeful and deceitful failure and refusal to do so was, in light of the current circumstances, clearly done to delay matters until Omagine, Inc. simply gave up (the identical strategy employed by MOT during the eight (8) years of negotiation of the Development Agreement) or until a time arrived that would be convenient for RCA to eliminate Plaintiff and bring in RCA's favored new investors to take control of the Project Land valued at approximately one billion USD ($1,000,000,000). In either event RCA could then consent to MOT's official termination of the Development Agreement putting itself in position to execute the Omagine Project (or some other immensely profitable real-estate project) on the highly sought-after and immensely valuable 245 acres of prime beachfront Project Land.

25.  As a result of RCA's conduct, actions, lack of action, and continued breach of its obligations under the Shareholder Agreement (including but not limited to its implied obligations of good faith and fair dealing), Omagine, Inc. has incurred damages of approximately nine hundred seventy-four million USD ($974,000,000) consisting of:

   a.  the approximately $931 million USD of lost profits that would have accrued to Plaintiff as a result of its sixty percent (60%) ownership of Omagine-Oman; and

   b.  the approximately $33 million USD of reimbursable Pre-Development Expenses incurred by Omagine-USA and obligated to be reimbursed to Plaintiff pursuant to the terms of the Shareholder Agreement; and

   c.  the $10 million USD Success Fee mentioned in clause 7 above that otherwise would have been paid to Plaintiff absent Defendant's breach of its obligations under the RCA Shareholder Agreement.

   Please see Exhibits B, E, F, G, H, I and J attached hereto.

26.  Reservation of rights and relief sought wherefore, as stated above, Omagine, Inc. reserves the right to advance further arguments and produce such further evidence, factual or legal, as

necessary to complete or supplement the presentation of the claims or to respond to any arguments or allegations advanced by Defendant. The Plaintiff also reserves the right to produce further documentary evidence and to produce witness evidence in order to supplement and support the claims made in this Request. Without prejudice to the rights to amend, supplement, or restate the relief to be requested, Omagine, Inc. respectfully requests that this Honorable Court grant the following relief:

a. A declaration that RCA as the personal representative of Sultan Qaboos bin Said has breached its obligations under the Shareholder Agreement including but not limited to its implied obligations of good faith and fair dealing;

b. Compensation to Omagine, Inc. in an amount of approximately $931 million USD for the lost profits that would have accrued to Plaintiff as a result of its sixty percent (60%) ownership of Omagine-Oman (Please see Exhibits B, E, F, G, H, and I attached hereto); and

c. Compensation to Omagine, Inc. in the amount of the approximately $33 million USD of reimbursable Pre-Development Expenses incurred by Omagine-USA and obligated pursuant to the terms of the Shareholder Agreement to be reimbursed to Plaintiff (Please see clause 16 of Exhibit B and Exhibit J attached hereto);

d. Compensation to Omagine, Inc. in the amount of $10 million USD representing the Success Fee to be paid to Plaintiff pursuant to the terms of the Shareholder Agreement (Please see clause 16 of Exhibit B attached hereto);

e. Costs associated with these proceedings, including all professional fees and disbursements;

f. Pre-award and post-award interest at a rate to be fixed by the Court; and

g. Such further relief that this Court may advise and that this Court may deem appropriate including but not limited to punitive damages against RCA for its damaging conduct and actions, purposeful delays, defaults and failure to meet its obligations under the Shareholder Agreement (including its obligations of good faith and fair dealing), all of which have inflicted enormous financial losses on Plaintiff and severely damaged Plaintiff's financial condition, business reputation and future prospects.

DATE OF ISSUE: March 12, 2019

JEFFREY A. KOSTERICH, LLC

By: _____
    Jeffrey A. Kosterich, Esq.
    Counsel for Plaintiff
    68 Main Street
    Tuckahoe, New York 10707
    (914) 395 — 0055 (phone)
    (914) 395 — 0230 (facsimile)